UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

KERRI ANNE HARDER,          )
                            )
              Plaintiff     )
                            )  CAUSE NO: 2:11-cv-00370
       vs.                  )
                            )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security,)
                            )
              Defendant     )


OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, Kerri Anne Harder, on October 11, 2011. For the reasons set forth below, the decision of the Commissioner is **REMANDED.**

Background

The claimant, Kerri Harder, applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), alleging a disability onset date of September 18, 2008. (Tr. 179-80) Her claim initially was denied on December 2, 2009, and again upon reconsideration on March 12, 2010. (Tr. 25) Harder requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held before ALJ Karen Sayon on November 8, 2010, at which Harder, her mother Heather Harder, and Vocational Expert ("VE") James Brave testified. (Tr. 25, 65)

On November 22, 2010, the ALJ issued her decision denying benefits. (Tr. 36-37)  The ALJ found that Harder was not under a disability within the meaning of the Social Security Act from September 18, 2008, through the date she issued her decision. (Tr. 36) Following a denial of her request for review by the Appeals Council, Harder filed a complaint with this court.

Harder was born on August 20, 1973, making her 37 years old on the date of the ALJ's decision.  (Tr. 49)  She is 5'3" and weighs approximately 175 pounds.  (Tr. 347)  Harder is single and resides with her mother.  (Tr. 49)  Her education level includes up to her junior year in college.  (Tr. 50)

Harder has not worked since September 2008.  (Tr. 50) Before Harder became disabled, she worked as a costume stylist at Media Services in Los Angeles, California.  (Tr. 51) Her duties included fitting actors for costumes, providing materials to actors in trailers, and helping the actors on set.  (Tr. 51, 305) Harder was on her feet for most of the day.  (Tr. 51)  Prior to this, Harder worked as an actress for Entertainment Partners for about four years.  (Tr. 305)  During this time, she acted in a variety of roles appearing in commercials, television, and movies.  (Tr. 52)

Prior to her work in the entertainment industry, Harder worked at a bookstore that her mother owned, Lighthouse Gallery &

Bookstore. (Tr. 53) Harder helped her mother manage the store and was in charge of setting out displays, ordering and taking stock, putting stock away, and overseeing employees. (Tr. 53) Harder also previously worked for Bodega Chocolates doing road shows. (Tr. 54, 305) She was responsible for going to different Costco stores and setting up demonstrations for customers. (Tr. 53) Usually there was another person with her helping her unload and set up the demonstrations, but occasionally she had to do it herself. (Tr. 54) The heaviest amount of weight she had to lift at this job was around 50 pounds. (Tr. 55) Harder also worked full-time as a bartender at McGee's. (Tr. 55, 305) Her primary duties included stocking the bar, transporting liquor, stocking dishes, and cleaning. (Tr. 55)

On September 18, 2008, Harder sustained an injury to her lower back when she fell while she was working as a costume stylist for Media Services. (Tr. 56, 305) An MRI taken on October 25, 2008, revealed that Harder had a herniated disc at L5-S1 with mild ligamentum flavum and facet arthropathy, as well as bulging discs at T11-12, T12-L1, L1-2, and L2-3. (Tr. 381-82) Harder had chronic pain because of this injury. (Tr. 56) She rated the continuous pain at about a 6 or 7 on a scale of 1 to 10. (Tr. 56) Her pain was the most severe in her lower back, but occasionally it spread to her middle back and neck. (Tr. 56)

Harder also had sciatica down her legs, which caused her to fall frequently. (Tr. 56) She sometimes experienced a numbness in her arms, and less frequently in her entire body, which she compared to being paralyzed. (Tr. 56) Harder testified that at times, she could not move or talk and that was when she was in the most pain. (Tr. 56)

On June 16, 2009, Harder returned to Indiana to live with her mother. (Tr. 49) She subsequently sought treatment from Dr. Brent Jacobus, M.D., a doctor who had treated her for many years before she moved to California. (Tr. 506-526) Dr. Jacobus identified moderate impairments in Harder's ability to sit, stand, and walk, as well as significant impairments in most other postural functions. (Tr. 431) Dr. Jacobus also noted that her prognosis after treatment for her lumbar disc disease and chronic pain syndrome was poor. (Tr. 431)

Harder began treatment with Regional Mental Health Center. A diagnostic assessment was performed on March 4, 2010, which noted severe anxiety and depression. (Tr. 443) Harder's symptoms included, among other things, suicidal ideation, insomnia, diminished self esteem, agitation, excessive worry, and panic attacks. (Tr. 443) At that time, Harder received a primary diagnosis of major depression, recurrent and severe, with a secondary diagnosis of an anxiety disorder due to her general

medical conditions.  Harder also received a Global Assessment of Functioning (GAF) score of 52, which is indicative of moderate difficulty in social, occupational, or school functioning.

During her  assessment on March 4, 2010, it was noted that Harder had felt depressed her whole life but that her depression had became worse after she was injured.  (Tr. 443, 462)  Harder reported that she had suicidal thoughts several times per week but that she did not have a current suicide plan.  (Tr. 443, 462)  Harder also reported that she had attempted to commit suicide twice in the past, once at about age five and once when she was 18.  (Tr. 443, 562)  The latter incident occurred when she was in college in 1992.  (Tr. 562)  The death of her grandmother and other family and friends prompted her depression.  (Tr. 562)  Harder's mother asked her to leave the house, causing Harder to become further depressed and to take approximately 50 Advil pills.  She was found in a car sleeping by a friend and was taken to the ICU where she stayed for a few days.  (Tr. 448, 562)

After the initial assessment, Harder's suicidal ideation fluctuated with an increase on May 13, 2010. (Tr. 601)  However, Harder did not have a suicidal plan.  (Tr. 601)  Her symptoms of depression, excessive worry, sleep and appetite disturbance, and panic attacks continued through August 19, 2010.  (Tr. 469, 471-

481, 559-628)  A Medical Assessment prepared by Harder's treating psychologist at Regional Mental Health Center, Robert Rajewski, Psy.D., on May 13, 2010, noted moderate and marked impairments in Harder's ability to understand, remember, and carry out complex instructions, make judgments on complex work-related decisions, respond appropriately with supervisors, and interact appropriately with supervisors, co-workers, and the public.  (Tr. 489-491)

A psychiatric evaluation performed on June 15, 2010, again showed that Harder had symptoms of depression, occasional suicidal ideation, and slightly impaired concentration.  (Tr. 630) At this time, Harder also was diagnosed with a major depressive disorder, recurrent and severe, with an anxiety disorder due to her general medical condition. (Tr. 629-30) Harder was assigned a GAF score of 49, which was indicative of serious difficulty in social, occupational, or school functioning.  (Tr. 629-30)

At the hearing before the ALJ, Harder testified that she occasionally would drive but that she generally received rides from her parents because she was afraid of anxiety attacks and drowsiness, which was a side effect of her medications.  (Tr. 49-50, 59)  She also testified that she was in pain all the time, which she typically rated as 6 or 7 on a scale of 10.  (Tr. 56) Harder explained that the pain was the greatest in her lower back

but that she sometimes experienced the same level of pain in her middle back and neck. She further complained that the pain occasionally traveled down her legs causing numbness, which led to her falling about twice a week. (Tr. 56) Harder testified that approximately once every two days she got a pain in her arms, which she referred to as a "dead arm". (Tr. 56, 57) She explained that this pain occurred for no apparent reason, lasted 30 minutes to an hour, and made it so she could not move her arms whatsoever. Her pain was at its worst when this feeling extended to her whole body, and she was unable to move or talk. (Tr. 56) She compared this feeling to being paralyzed and explained that this occurred about once a week and usually lasted one to two hours. (Tr. 58) While her pain was somewhat controlled by medication, her medications often made her drowsy and unable to think or focus. (Tr. 64)

When describing her symptoms of depression, Harder stated "the biggest one is I just don't want to live." (Tr. 60) She also described significant sleep disturbance as well as full blown anxiety attacks occurring as often as every three days. (Tr. 60) Harder compared her anxiety attacks to a heart attack and stated that it felt "like an elephant is standing on my chest and it hurts and I get dizzy. Sometimes I've fallen down and just had to lay there for a while and then it feels like I'm in a

movie, like I don't know what's real and what's not real." (Tr. 60)  These attacks lasted about 30 minutes and have increased since she fell, especially in the last six months.  (Tr. 61)

With respect to her impaired movement, Harder testified that she could sit or stand only for about 20 minutes.  She could walk only very short distances and could not lift anything over five pounds.  (Tr. 61)  When asked about her typical day, Harder responded that she woke up around 10:30 a.m. and took her medications.  She then laid in bed until 4:30.  At that time, she would get up, make a sandwich, and watch TV for about a half hour. (Tr. 62)  She went back to bed, put in a movie, and her dad would come over and visit with her.  Harder testified that she spent most of the day in bed and that she normally did not help with any household chores, unless it was a light load of laundry. (Tr. 62)

Insofar as help she required for taking care of her personal needs, Harder stated that her mother had to wash her hair in the shower, help her get dressed, and help her go to the bathroom. (Tr. 64)  Harder testified that she used to love dancing, sewing, and knitting but that she had not done any dancing or sewing since her fall.  She had attempted to knit, which she later quit. (Tr. 62)  With respect to socializing, Harder testified that she often talked on the phone with her mother, father, sister, and

best friend and went to Starbucks approximately once a week with her best friend.  (Tr. 63)  Harder testified that she had seen some movies since her fall and that she had taken trips with her mother to lunch and to Goodwill.  (Tr. 63)

Vocational Expert (VE) James Brave was next to testify at the hearing before the ALJ.  (Tr. 65)  The VE first went through all of Harder's past jobs, which are as follows: food demonstrator; actor; bartender; costume manager; and bookstore manager. (Tr. 66)  The VE concluded that all of Harder's previous jobs had an exertional level as light and a skill level as semi-skilled or skilled.  (Tr. 66)

The ALJ posed a hypothetical question to the VE, asking what work was available in the national economy for an individual 37 years old who had completed several years of college, had a work history identical to Harder's, and had limitations which included the following: light work, which was work that involved lifting and carrying up to ten pounds frequently, and 20 pounds occasionally; standing and walking about six out of eight hours in a workday, with the other time spent sitting; occasional postural activities which included climbing, stooping, kneeling, crawling, balancing, and crouching; only simple instructions; only routine tasks; no public interaction; and a sit/stand option that allowed

her to change positions while on task every hour for five minutes at a time. (Tr. 66-67)

The VE testified that Harder's past work would not be available because all of her previous jobs were classified as either skilled or semi-skilled. (Tr. 67) However, the VE stated that there were other jobs in the Greater Northwest Indiana and Chicago Metropolitan Area consistent with the hypothetical limitations. The VE testified that such a person could perform the light, unskilled jobs of mail clerk (6,500 positions), electrical accessories assembly (14,000 positions), and light hand packaging (25,000 positions). (Tr. 67)

The ALJ then asked the VE to add to the hypothetical only occasional interaction with supervisors and co-workers and further limit the employment to low stress work, defined as only occasional changes in the work setting. The VE testified that these additions to the hypothetical would have no effect on the previously identified jobs. (Tr. 67)

Next, the ALJ asked the VE to include all the previous limitations but instead restrict the hypothetical to sedentary work, rather than light work. The VE stated that such jobs would include certain sedentary bench assembly jobs such as eyeglass assembly (2,000), printed circuit board assembly (6,500), and possibly a job as a sorter (8,000). (Tr. 68)

The ALJ then asked the VE to add the following three situa-
tions separately to the ongoing hypothetical: 1) that the indi-
vidual would miss three days of work per month; 2) that the
individual had to lay down 30 percent of the day; and 3) that the
individual was off task 30 percent of the time due to drowsiness
from the side effects of medication.  The VE testified that the
employer would not tolerate any of these three situations if
added to the hypothetical.  (Tr. 68)

Harder's attorney then asked the VE to consider the addi-
tional marked limitations of interacting appropriately with the
public, interacting appropriately with supervisors, interacting
appropriately with co-workers, and responding appropriately to
usual work situations and to changes in a routine work setting.
(Tr. 69, 490)  The VE testified these marked limitations would
eliminate all possible jobs.  (Tr. 69)  The ALJ defined a marked
limitation as a serious limitation, substantial loss, and the
ability to effectively function.  (Tr. 69)

Harder's mother, Heather Harder, was the last to testify.
(Tr. 70)  Heather testified that Harder moved back in when she
was injured in her fall and currently lived with her.  (Tr. 71)
Heather also stated that Harder has had a problem with suicide
ideations for many years but that they increased since her
accident.  (Tr. 71)  Heather explained that Harder attempted

suicide twice in the past and that there were many nights when she stayed up with Harder to ensure that she did not attempt suicide again. (Tr. 71-72) Heather testified that Harder had a high level of stress because she always had high expectations for herself and experienced difficulty because she was not able to do much as a result of her injury. (Tr. 72) Heather then stated that she had to help Harder with a lot of activities around the house, including managing her own hygiene. Heather testified that Harder would neglect taking a bath or shower if she was left to do it herself. (Tr. 73)

In her decision, the ALJ discussed the five-step sequential evaluation process for determining whether an individual was disabled. (Tr. 26) In step one, the ALJ found that Harder had not engaged in substantial gainful activity since September 18, 2008, the alleged onset date. (Tr. 27)

At step two, the ALJ found that Harder suffered from the following severe impairments: degenerative disc disease of the lumbar spine, obesity, depression, and generalized anxiety disorder. (Tr. 27) The ALJ found that Harder's impairments significantly limited her ability to perform basic work activities. (Tr. 26)

At step three, the ALJ found that Harder's impairments did not meet or medically equal one of the listed impairments. (Tr.

28)  The ALJ noted that Harder's degenerative disc disease and obesity did not meet or equal Listing 1.04.  The ALJ went on to explain why Harder's mental impairments did not meet Listing 12.04 or 12.06.  In making this determination, the ALJ considered four broad functional areas for evaluating mental impairments, known as the "Paragraph B" criteria.  (Tr. 28)  To satisfy the "Paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction on activities of daily living; marked difficulties in maintaining social function-ing; marked difficulties in maintaining concentration, persis-tence, or pace; or repeated episodes of decompensation, each of extended duration.  (Tr. 28)

With regard to activities of daily living, the ALJ concluded that Harder had a moderate restriction.  (Tr. 28)  Harder testi-fied that her activities of daily living were extremely limited.  She stated that she spent a typical day in bed watching televi-sion.  Further, she reported that her left arm could be dead for a week and that her mother washed her hair, helped her get dressed, and helped her go to the bathroom.  She also testified that once a week she was paralyzed to the point where she could not move her entire body or even talk.  (Tr. 28)

At a consultative examination conducted by Dr. Gary Durak on November 17, 2009, Harder reported that she needed assistance

with grooming and bathing, but that she could do her own dress-
ing, very simple cooking, and very light cleaning.  (Tr. 28, 393)
However, Harder also testified that she and her best friend often
went to Starbucks together.  During her consultative examination
with Dr. Larry Kravitz in July 2010, Harder stated that she had a
boyfriend and that she planned to go on two dates the upcoming
weekend.  (Tr. 28)  Overall, the ALJ found that Harder only had
moderate difficulties in activities of daily living, explaining
that she gave great weight to Dr. Kravitz's response to a medical
interrogatory which assessed Harder with mild to moderate limita-
tions in all areas of social functioning.  (Tr. 28, 500)

    With regard to social functioning, the ALJ focused on the
fact that during Harder's consultative examination on November
17, 2009, Dr. Durak noted that Harder was cooperative and able to
interact with the examiner.  (Tr. 28, 392)  The ALJ again noted
that Harder had a boyfriend who she went on dates with on the
weekends, talked to her friend on the phone, and occasionally
went to Starbucks with her friend. (Tr. 28) The ALJ also consid-
ered that Harder's mother reported that she could be "difficult
to be with" and that Harder generally was home bound. (Tr. 28,
239) The ALJ concluded that Harder also had moderate difficulties
in social functioning. (Tr. 28,  500)

With regard to concentration, persistence, and pace, the ALJ found that Harder had some difficulties with attention and concentration due to her depression. (Tr. 28, 392) However, she was able to recall four out of six items after ten minutes, and she successfully completed 18 out of 20 arithmetic calculations. (Tr. 28, 393) Also, a March 2010 examination showed that Harder's memory, attention, and concentration were all within normal limits. (Tr. 28, 445) Overall, the ALJ found that Harder only had moderate difficulties in concentration, persistence, or pace. (Tr. 68, 500)

As to episodes of decompensation, the ALJ based her opinion on the fact that there was no evidence in the record that Harder ever had been hospitalized due to her mental symptoms or that she had experienced such an exacerbation of her symptoms. (Tr. 28) Therefore, the ALJ found that the claimant had no episodes of decompensation. (Tr. 29, 500, 505)

Accordingly, because Harder's mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended dura-tion, the ALJ determined that the "Paragraph B" criteria were not satisfied. (Tr. 29) The ALJ noted that she gave great weight to the opinion of Dr. Kravitz, who was a non-examining source. (Tr. 493) Dr. Kravtiz concluded that Harder had moderate limitations

in daily living, social functioning, concentration, persistence or pace, and no repeated episodes of decompensation. (Tr. 500) The ALJ gave greater weight to the opinion of Dr. Kravitz given in response to the medical interrogatory than to that of Harder's treating physician, Dr. Rajewski, because she found that Dr. Kravitz's opinion was well-supported and consistent with the evidence of record. (Tr. 34) The ALJ further found that Dr. Rajewski's opinions were not supported by his own treatment records and thus should not be given controlling weight. (Tr. 34)

The ALJ explained that the limitations found in the "Paragraph B" criteria were not a residual functional capacity (RFC) assessment but that they were used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. (Tr. 29) She also concluded that the mental RFC assessment used at steps 4 and 5 of the sequential evaluation process required a more detailed assessment by itemizing various functions contained in the broad categories of Paragraph B, which in turn reflected the degree of limitation found in the "Paragraph B" mental functional analysis. (Tr. 29)

The ALJ also considered whether Harder satisfied the "Paragraph C" criteria and determined that she did not because there was no evidence of episodes of decompensation for extended dura-

tion, that a minimal increase in mental demands or change in environment would cause Harder to decompensate, or that Harder was unable to function outside a highly supportive living arrangement. (Tr. 29) Thus, the ALJ concluded that the evidence failed to establish the presence of "Paragraph C" criteria. (Tr. 29)

At step 3, the ALJ concluded that Harder had the residual functional capacity to perform light work as defined in 20 C.F.R. §§404.1567(b) and 416.976(b), except that she only could climb, stoop, kneel, crawl, balance, and crouch occasionally; should have a sit/stand option that allowed her to change positions every hour for five minutes at a time; and was limited to only simple instructions, routine tasks, not public interaction, and low stress work, and only occasional interaction with supervisors and coworkers. (Tr. 30)

The ALJ explained that Harder alleged a disability due to a back and right hip injury, five bulging discs, a lacerated disc, and sciatica, along with insomnia, depression, anxiety, and teeth grinding. (Tr. 30) Harder reported that she was in constant pain, had numbness in her arms and legs, and had difficulty walking. At the hearing, Harder testified that the pain she experienced in her lower back was rated at a 6 or 7 on a 10 point scale. Her legs would go numb and she would fall approximately

twice a week. Sometimes her arm would go numb for 30 to 60
minutes, and she could not use it. (Tr. 30) She used a cane but
did not have a prescription for it. She reported receiving
epidurals for her back pain, but surgery was not an option
because she was too young. Harder took medications and experi-
enced drowsiness, dry mouth, loose teeth, toenails being pulled
off, and weakness as side effects. (Tr. 30)

With regard to her mental impairments, Harder testified that
she did not want to live, had difficulty sleeping, and had panic
attacks. (Tr. 30) The ALJ also noted that Harder testified
about her daily activities, which included staying in bed most of
the day, eating, and watching television. She could do a load of
laundry occasionally, talked to her best friend on the phone, and
occasionally would go to lunch with her mother or to Starbucks
with her best friend. Harder's mother helped her wash her hair,
get dressed, and go to the bathroom. (Tr. 30)

The ALJ stated that she found the "claimant's medically
determinable impairments could reasonably be expected to cause
the alleged symptoms; however, the claimant's statements concern-
ing the intensity, persistence and limiting effects of these
symptoms are not credible to the extent they are inconsistent
with the above residual functional capacity assessment." (Tr.

30-31) The ALJ based her reasoning on inconsistencies within the record and proceeded to summarize the medical evidence.

On Harder's alleged onset date of September 18, 2008, an x-ray of her hip revealed no abnormality, and her pain was only a 3 out of 10. (Tr. 31, 330) Subsequently, MRI scans of Harder's lumbar spine and right hip were performed on October 25, 2008 and October 31, 2008, respectively. (Tr. 31) The MRI of her spine revealed minimal 1-2 mm disc bulges without central canal stenosis or foraminal encroachment at the levels of T11-12, T12-L1, L1-2, and L2-3, and a 2-3 mm disc protrusion without central canal stenosis or neural foraminal encroachment at L5-S1. (Tr. 31) The MRI of Harder's right hip revealed a small right hip joint effusion but no other abnormalities.

The ALJ next noted that Harder underwent an initial orthopedic evaluation on November 6, 2008. (Tr. 31) She reported mid and low back pain, but she stated that pain medication helped and that she had no memory loss. Harder was able to ambulate, her hip range of motion was normal, she had a negative straight leg raise, and only exhibited some tenderness in the lumbosacral midline. Harder was assessed with a lumbar strain and degenerative disc L5-S1 with small central disc protrusion and annular tear without stenosis. (Tr. 31) Harder was told that she could return to work with lifting, pushing, and pulling limitations of

no greater than five pounds, no standing longer than 15 minutes or sitting longer than 30 minutes at a time, and no bending, stooping, squatting, kneeling, or climbing. She was advised to undergo physical therapy and take Ibuprofen, Soma, and Darvocet. Harder attended two physical therapy sessions and reported her discomfort as a 5 to 7 out of 10. (Tr. 31)

Harder underwent a medical examination as required by her insurance provider. (Tr. 31) The consulting physician assessed Harder with multilevel intervertebral lumbar disc syndrome as well as a sprain of the right hip. (Tr. 32) The doctor determined that she had an 8% whole person impairment and that she was temporarily totally disabled from September 18, 2008 through May 19, 2009, when she reached maximum medical improvement. (Tr. 32) He determined that Harder was precluded from performing her usual and customary work as a wardrobe stylist because of the lifting, bending, twisting, and standing requirements. (Tr. 32)

Harder also had a consultative examination as required for her claim for disability benefits. Harder walked into her examination without an assistive device. (Tr. 32) She was unable to do range of motion testing due to low back pain and hip pain, but she had a normal gait. She had 3-4/5 muscle strength in both upper extremities and 5/5 muscle strength in her lower extremities. Harder reported tingling and numbness in the left

upper extremity and dorsum of her right foot, but she had good grip strength in both hands.  (Tr. 32)

The ALJ also acknowledged that Harder had a history of depression and anxiety.  (Tr. 32)  Harder underwent a psychological evaluation on November 17, 2009.  At the examination, she maintained good eye contact and was alert, although she had some problems with concentration and memory.  Her thought processes and content were within normal limits, but her mood and affect reflected depression and anxiety.  (Tr. 32) The claimant was able to recall seven digits forward and four digits backwards, was able to recall four of six items after ten minutes, and was able to complete serial subtractions in one minute with no errors. The consulting physician assigned her a Global Assessment of Functioning (GAF) score of 45.  (Tr. 32)

Harder began treatment for anxiety and depression on March 4, 2010.  She reported feeling fatigue, irritability, poor concentration, restlessness, and panic attacks.  (Tr. 32) She reported lifelong depression, but she had not received any treatment since her 1991 suicide attempt.  On examination, her mood was depressed and affect was sad, but her memory, attention, concentration, judgment, and insight were within normal limits. (Tr. 32) She was assessed with major depression recurrent and

severe and anxiety disorder and was assigned a GAF of 52. She began regular treatment for her depression. (Tr. 33)

Harder underwent a psychiatric evaluation on July 15, 2010. (Tr. 33) She reported that her family doctor put her on Cymbalta and Amitriptyline. She was alert and oriented at the examination and had a logical and sequential thought process, but her mood was depressed. She was assessed with a current GAF score of 49. (Tr. 33).

After summarizing the medical findings, the ALJ discussed Harder's testimony concerning her activities of daily living. (Tr. 33) The ALJ noted that Harder testified that she spent the typical day in bed watching television, that her left arm could be dead for a week, and that her mother helped her groom herself. She stated that once a week she was paralyzed to the point where she could not move her body for one to two hours. Harder had difficulty with self-care, personal hygiene, riding in the car, and prolonged sitting. (Tr. 33) She also testified that she often talked to her best friend, went to Starbucks with her best friend, and went on two dates in one weekend with her boyfriend. (Tr. 33) Harder also testified to numerous side effects, but none ever were documented by her physicians. Harder also noted that her pain was managed with pain medication. (Tr. 34)

With regard to her mental health, the ALJ explained that she did not find Harder credible because although the record reflected a depressed mood and panic attacks, she generally was cooperative, could perform tasks on consultative evaluation, and sustained concentration to read, watch movies, knit, sew, and socialize. (Tr. 34)

The ALJ explained that neither Harder nor any of her treating physicians found that her weight had any additional impact on her ability to sit, stand, or perform any postural limitations. (Tr. 34) The ALJ took her obesity into consideration in limiting her to less than light RFC. This was reflected in her restriction to change positions every hour for five minutes at a time and only occasionally climb, kneel, crouch, crawl, balance, and stoop. (Tr. 34)

The ALJ stated that she gave great weight to Dr. Kravitz's opinion because it was well supported by the evidence. (Tr. 34) She stated that Harder's treating physician, Dr. Rajewski, offered an opinion a few months after Dr. Kravitz, but that his opinion imposing marked and moderate limitations in all areas was not supported by his own treatment records. Dr. Rajewski's opinion was not consistent with Harder's ability to recall four out of six items after a delay, to complete 18 out of 20 math problems successfully, and to complete serial subtraction cor-

rectly.  The mental health notes also were devoid of significant concerns about concentration or memory.  (Tr. 34)

The ALJ also gave great weight to the opinion of the state agency physician with regard to Harder's physical impairments. (Tr. 34) Although Dr. Brian Grossman assigned significant limitations, he did so after treating Harder once very shortly after her injury.  (Tr. 35) The ALJ found that the limitations were not proportional to Harder's injury because her gait was guarded, but non-antalgic, her straight leg raises were negative bilaterally, and there were no focal motor or sensory deficits of the lower extremities.  The ALJ also stated that Dr. Jacobus found moderate to severe limitations in all areas, but he offered the opinion on the first day he saw Harder and was not a treating source.  (Tr. 35)

At step 4, the ALJ determined that Harder was unable to perform any past relevant work.  (Tr. 35)  Considering Harder's age, education, work experience, and RFC, the ALJ concluded that there were jobs that Harder could perform, including mail clerk (6,500 positions), electronics assembler (14,000 positions), and hand packager (25,000 positions).  Ultimately, the ALJ decided that Harder was not disabled, as defined in the Social Security Act, from September 18, 2008, through the date of this decision. (Tr. 36)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept to support such a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852 (1972) (*quoting* *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. The claimant must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §404.1520. The ALJ first considers whether the claimant is presently employed or engaged in substantial gainful activity. 20 C.F.R. §404.1520(b). If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining

capability, the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. §404.1520(e). However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

Harder raises three challenges to the ALJ's denial of disability benefits: 1) that the ALJ failed to give appropriate weight to the treating psychiatrist's and physician's opinions, 2) that the hypothetical questions posed to the vocational expert failed to list fairly all of the claimant's impairments, and 3) that the functional limitations suggested by Harder's treating psychologist were well supported by the record, and since the VE testified at the hearing that those limitations would preclude all work, the ALJ's decision should be reversed.

Harder first complains that the ALJ failed to give proper weight to her treating psychologist, Dr. Rajewski. Harder points to numerous records showing that she was depressed and considered

suicide, and she accuses the ALJ of cherry-picking her better days to support her decision to assign greater weight to Dr. Kravitz's opinion. The ALJ acknowledged that Harder suffered depression, but she determined that the record did not reflect that her symptoms were severe enough to warrant a disability determination.

A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable and clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §404.1527(d)(2). *See also Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Gudgell v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. *Schmidt*, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion 'is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for revising or rejecting evidence of disability.'"). *See, e.g., Latkowski v. Barnhart*, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004);

*Jacoby v. Barnhart*, 93 Fed. Appx. 939, 942 (7th Cir. 2004). Once well-supported, contradictory evidence is introduced, the treating physician's opinion no longer is controlling, but it remains a piece of evidence for the ALJ to weigh. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). Ultimately, the weight assigned to a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician also may "bend over backwards to assist a patient in obtaining benefits . . . [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." *Hofslien*, 439 F.3d at 377 (internal citations omitted). In any case, the ALJ must minimally articulate her reasons for crediting or rejecting a treating physician's opinion. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (*quoting Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)). *See also* 20 C.F.R. §404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Dr. Rajewski, Harder's treating psychologist, determined that Harder had moderate or marked impairments in all areas of social functioning. Specifically, he found that Harder had moderate limitations in her ability to understand and remember

simple instructions, carry out simple instructions, and make judgments on simple work-related activities. (Tr. 489) He also concluded that Harder had marked limitations on her ability to understand and remember complex instructions, carry out complex instructions, make judgment on complex work related activities, interact with the public, supervisors, and co-workers, and respond to usual work situations. (Tr. 489-90) He also noted on his assessment that Harder had severely impaired concentration because of her depression. (Tr. 489)

The ALJ rejected this assessment in favor of Dr. Kravitz's opinion, which concluded that Harder had mild to moderate limitations in all areas. (Tr. 494-95) In making this assessment, the ALJ explained that Dr. Rajewski's opinion was not consistent with his own treatment records because Harder was able to complete math problems, recall items after a delay, and do serial subtraction correctly. (Tr. 34) The ALJ incorrectly stated that these tests were performed by Dr. Rajewski. The record shows that Dr. Durak conducted the examination to which the ALJ referred. Regardless, the ALJ pointed to both the absence of evidence in Dr. Rajewski's treatment notes that supported his assessment and evidence of record that contradicted Dr. Rajewski's opinion.

In her opening brief, Harder stated that her treatment notes reflect difficulties in concentration, referring the court to

three entries.  On March 4, 2010, Dr. Rajewski's notes state that Harder had anxiety, a symptom of which was poor concentration, and on June 15, 2010, she reported that she had difficulty concentrating at her psychiatric evaluation.  (Tr. 443, 629) Although the psychiatric report states that Harder reported poor concentration, Dr. Jose Ramirez later noted that her "concentration is perhaps slightly impaired." (Tr. 630) This observation is inconsistent with Dr Rajewski's conclusion that Harder suffered a severe limitation.  Dr. Ramirez also concluded that Harder was engaging, alert, and oriented.  Her thought processes were logical and sequential, her intelligence is average, and her judgment was okay.  (Tr. 630)  Harder also referred the court to the treatment note from May 3, 2010, which makes no mention of difficulties concentrating.  (Tr. 462)  Instead, Dr. Rajewski stated that Harder appeared "alert, oriented and cooperative during the interview." (Tr. 462)

Harder argues that the treatment notes are littered with evidence of her depressed mood, excessive worry, sleep and appetite disturbance, panic attacks, and fluctuations in suicidal ideation, and that these are indicative of difficulty concentrating.  The court agrees that the record clearly reflects that she was depressed and experienced these symptoms, but the court is unwilling to conclude that she experienced poor concentration to

such a degree that it impaired her ability to work simply because it is a symptom of depression and anxiety. With the exception of Dr. Rajewski's note in his assessment of Harder, the record is devoid of any evidence to support a conclusion that Harder experienced a "marked" limitation in her ability to concentrate. Dr. Rajewski never noted such a severe limitation in his treatment notes. Rather, as the ALJ explained, the objective evidence contradicts such a finding. Dr. Durak's evaluation revealed that Harder was capable of concentrating long enough to complete 18 out of 20 math problems correctly and to do serial subtractions and that she was able to memorize and recall four out of six objects after a lapse of time. Harder also testified that she could sustain concentration long enough to read, watch movies, knit, sew, and socialize. Both Dr. Rajewski and Dr. Ramirez reported that Harder was engaging, alert, and oriented, and that Harder was capable of interacting with the examiners on all occasions.

It is not the court's job to re-weigh the evidence. Rather, the court must consider whether the ALJ provided a sufficient explanation for her conclusion, and here the ALJ was able to point to both the absence of supporting medical records and the contradictory objective medical findings. To the extent the record contained any indication of difficulty concentrating, the

ALJ sufficiently explained that the evidence did not support a finding that this limitation was severe.

Harder criticizes both Dr. Kravitz's opinion for failing to state that Harder had increased suicidal ideation as acknowledged in Dr. Rajewski's opinion a few months prior, and the ALJ for stating that Dr. Kravitz's opinion was rendered before Dr. Rajewski's.  However, the court finds that the ALJ's error as to the chronology of reports to be merely a minor misstatement.  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) ("Berger is able to point to minor errors in the ALJ's reasoning. . . .  But these misreads prove to be outliers and do not indicate that the ALJ's decision lacked an adequate factual basis.").  The opinions were rendered during the same time period, and this minor error does not mean that the ALJ did not closely examine the record.  If anything, the fact that Dr. Rajewski's opinion was offered before Dr. Kravitz's opinion works against Harder, as it may suggest that Harder improved since Dr. Rajewski's report was issued.  Moreover, Dr. Kravitz was not required to include something in his assessment that he did not observe, and Harder submitted no evidence to show that she reported increased suicide ideations to Dr. Kravitz.

Harder next argues that the ALJ "cherry-picked" the evidence because she relied only on Harder's good days when rendering her

decision and disregarded her bad days.  However, the record
reflects otherwise.  The ALJ engaged in a detailed discussion of
Harder's bad days.  The ALJ addressed Harder's testimony, which
explained that on a typical day she stayed in bed most of the
day, eating and watching television.  (Tr. 30) Harder's mother
had to help her wash her hair, get dressed, and go to the bath-
room.  (Tr. 30) The ALJ acknowledged that Harder's arm sometimes
would go dead and that sometimes she felt paralyzed.  (Tr. 33)
The ALJ pointed to the doctor's notes explaining that Harder had
life long depression and suicidal ideations.  (Tr. 32) Although
the ALJ eventually found that Harder's testimony regarding her
bad days was not supported by the objective medical evidence, the
record clearly reflects that the ALJ considered both her good
days and bad days. As addressed more thoroughly above, the ALJ
went on to explain the contradictions she found in the record and
sufficiently articulated and supported her decision.

Harder finally complains that the ALJ erred in rejecting Dr.
Rajewski's opinion because it was supported by Dr. Durak's con-
clusion and complains that the ALJ provided no explanation for
rejecting Dr. Durak's opinion.  However, it is not clear that Dr.
Durak's opinion provided support for Dr. Rajewski's assessment.
It is true that Dr. Durak concluded that Harder suffered from
Major Depression, with severe psychosocial stressors and assigned

a GAF score of 45, indicating severe symptoms or serious impair-
ment in functioning.  However, Dr. Durak also stated that Harder
was cooperative, able to interact, alert, and had average intel-
ligence.  She was able to complete every task during the examina-
tion, including recalling objects, completing math problems, and
responding to questions that required general knowledge.  The
only consistency Harder pointed to between Dr. Durak's opinion
and Dr. Rajewski's was the GAF score Dr. Durak assigned Harder,
indicating severe symptoms.

The GAF scale measures a "clinician's judgment of the
individual's overall level of functioning." *Am. Psychiatric
Ass'n, Diagnosis and Statistical Manual of Mental Disorders*,
Fourth Edition, Text Revision, 32, 34 (2000) (DSM IV-TR).  The
established procedures require a mental health professional to
assess an individual's current level of symptom severity and
current level of functioning, and adopt the lower of the two
scores as the final score.  *Id*. at 32—33.  A GAF score ranging
from 41—50 indicates serious symptoms; scores ranging from 51—60
indicate moderate symptoms; and scores ranging from 61—70 indi-
cate mild symptoms.  *Id.*  Because the GAF scores reflect the
lower of the plaintiff's severity of symptoms and functional
level, the score does not reflect the clinician's opinion of

functional capacity. *Id.*; ***Denton v. Astrue***, 596 F.3d 419, 425 (7th Cir. 2010).

Although Dr. Durak assigned Harder a low GAF score, it is not conclusive that his opinion was consistent with Dr. Rajewski's assessment of Harder's functional capacity. Rather, his treatment notes, which the ALJ took into consideration when rendering her opinion, suggest that Harder was able to interact and concentrate. Dr. Durak noted that Harder was alert, cooperative, and had average intelligence. He did not include any limitations in concentrating or interacting with others, much less moderate or marked limitations in these categories.

Harder also criticizes the ALJ's failure to mention Dr. Durak in her opinion. Harder is correct that the ALJ made no mention of Dr. Durak, and instead erred by stating that the examination Dr. Durak conducted was performed by Dr. Rajewski. The ALJ had a responsibility to consider all of the evidence of record and to address the evidence that contradicted her conclusion. However, the record reflects both that the ALJ considered Dr. Durak's opinion and that she found it to contradict Dr. Rajewski's.

In her opinion, the ALJ specifically referred to Dr. Durak's examination and the results of his clinical test as the basis of her explanation for rejecting Dr. Rajewski's assessment. The ALJ

rejected Dr. Rajewski's opinion that Harder had severe problems concentrating, in part, because the objective medical evidence showed that Harder successfully completed 18 out of 20 math problems, was able to do serial subtraction correctly, and could recall four out of six items after a delay. Although the ALJ misstated that Dr. Rajewski conducted this examination, the record reveals that Dr. Durak was the clinician who actually performed the tests. This minor misstatement does not provide grounds to overturn the decision. It is evident that the ALJ considered Dr. Durak's opinion, as she specifically referred to it when explaining why she found Dr. Rajewski's opinion unsupported by the evidence. Moreover, the ALJ's reliance on Dr. Durak's examination as the basis of rejecting Dr. Rajewski's assessment shows that she found his examination inconsistent with Dr. Rajewski's assessment. It would be futile to remand this issue to the ALJ when the record reflects both that Dr. Durak's opinion was considered and that the ALJ found it to contradict Dr. Rajewski's.

Harder also claims that the ALJ substituted her own opinion for that of the treating physician and made judgments not substantiated by objective medical evidence. The ALJ cannot substitute her own opinion for that of the physicians of record. *See May v. Apfel*, 1999 WL 1011197, *17 (Sept. 30, 1999). When

determining the RFC, the ALJ must substantiate her opinion with the evidence and resolve disagreements between her conclusion and conflicting medical evidence. *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). However, the responsibility to determine the claimant's RFC is reserved for the ALJ. *Diaz v. Chater*, 55 F.3d 300, 306, n.2 (7th Cir. 1995). The ALJ need not rely exclusively on the opinions of the physicians. Rather, she must take the entire record into consideration, including all medical and non-medical evidence. *Diaz*, 55 F.3d at 306, n.2.

Although the ALJ did not adopt Dr. Rajewski's assessment of Harder's functional capacity, the record does not reflect that the ALJ "played doctor" and substituted her opinion for that supported by the medical evidence. Rather, the ALJ found that a conflict arose between Harder's testimony, Dr. Rajewski's assessment of Harder's functional capacity, and the opinion of Dr. Kravitz. The ALJ resolved the conflict by adopting Dr. Kravitz's assessment. In doing so, the ALJ explained that she considered the record as a whole and found Dr. Kravitz's opinion most consistent with the medical and non-medical evidence of record. As explained more thoroughly above, the ALJ fully articulated her reasons for rejecting Dr. Rajweski's opinion and pointed to the inconsistencies between his assessment and the record as a whole. Because the ALJ relied on medical evidence, specifically Dr.

Kravitz's opinion, the court is unable to conclude that the ALJ made judgments not supported by the medical evidence.

Harder next argues that the ALJ incorrectly discounted the physical limitations posited by Dr. Jacobus in his October 4, 2009 report to Indiana Medicaid. The ALJ found that Dr. Jacobus was not a treating source when he rendered his opinion because he offered his opinion on the first day he saw Harder. Harder argues Dr. Jacobus had treated her for years before she moved to California and that he had resumed treatment four months before the report was authored.

A treating physician is defined as a medical source "who provides you, or has provided you, with medical treatment or evaluation and who has, or has had an ongoing treatment relation-ship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." 20 C.F.R. §404.1502. The ALJ may consider the length and frequency of that relationship when determining how much weight to assign to a doctor's opinion. 20 C.F.R. §404.1527(c)(2). Greater weight is assigned the more times the treating source has examined the claimant and the more

knowledge the treating source has regarding the claimant's condition.  20 C.F.R. §404.1527(c)(2)(i)-(ii).  The reason the court gives the treating physician greater weight is because of that physician's familiarity with the claimant's condition. *Neveroski v. Astrue*, 2008 WL 2626754, *5 (N.D. Ind. June 26, 2008).  Therefore, a  physician who examines the claimant one time has not observed the claimant with the frequency required to establish a treating relationship.  *Neveroski*, 2008 WL 2626754 at *9.  A one-time examination should be afforded less weight when it is contradictory to the other evidence of record.  *Criner v. Barnhart*, 208 F.Supp.2d 937, 955 (N.D. Ill. 2002).

Although Dr. Jacobus had a prior history with Harder, there was a four year gap between examinations, and he only examined her once after the accident before offering his assessment.  This is not the type of frequency contemplated by the regulations for establishing a treating relationship.  Dr. Jacobus' familiarity with Harder's impairments was limited to one examination since her disabling impairments arose and was equivalent to the familiarity of the consultative physicians' one time examination.  Dr. Jacobus did not examine Harder with the frequency since her accident to require the ALJ to treat his opinion as that of a treating physician.  Moreover, even if the court were to impose such a requirement and find that Dr. Jacobus was a treating

physician, the ALJ was entitled to consider the treatment history and general knowledge Dr. Jacobus had with Harder's condition, and here it was no greater than that of the consultative physicians. For this reason, the ALJ was permitted to assign little weight to Dr. Jacobus' assessment.

Other than the ALJ's explanation that Dr. Jacobus was not a treating physician, Harder raised no further objections to the weight the ALJ assigned Dr. Jacobus' opinion. The ALJ pointed to several contradictions between Dr. Jacobus' opinion and the evidence. The ALJ noted that the limitations he proposed were not proportionate to the findings on examination because Harder's gait was guarded, but non-antalgic, her straight leg raises were negative bilaterally, and there were no focal motor or sensory deficits in the lower extremities. Together, the limited treatment history and contradictory evidence provided sufficient support for the ALJ's conclusion.

Harder next argues that the ALJ failed to consider all of her complaints in combination when determining whether Harder's impairments were severe. When a claimant has multiple impairments, the ALJ must consider the cumulative effect of the claimant's impairments to determine if she is disabled. *Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). Although a claimant may not

have a single impairment that meets a Listing, the ALJ must determine whether the cumulative effect is equivalent to a Listing. *Honeysucker v. Bowen*, 649 F.Supp. 1155, 1159 (N.D. Ill. 1986). Additionally, the ALJ must fully articulate her RFC finding by addressing all the evidence of record and its cumulative effect on the claimant's residual functionality. *Wintersmith v. Sullivan*, 1989 WL 99746, *2 (N.D. Ill. Aug. 17, 1989). To accomplish this, the ALJ must develop the record and solicit the opinion of a medical expert who has considered the cumulative effect of the claimant's impairments. *Wintersmith*, 1989 WL 99746 at *2. "[U]nder the regulations the ALJ must evaluate both the claimant's physical and mental RFC" when determining the level of work the claimant is capable of performing. *Wintersmith*, 1989 WL 99746 at *2.

Harder complains that her physical impairments were a catalyst for her depression and that the ALJ should have addressed this in her opinion. However, the ALJ's opinion reflects that she considered the combined effect of Harder's physical and mental impairments. In addition to her statements that she considered Harder's impairments individually and in combination and considered the entire case record, the ALJ engaged in a detailed explanation of Harder's depression and determined that it did not have the types of disabling effects that would inter-

42

fere with her ability to work.  The ALJ acknowledged that the
treatment notes contained references to depression and suicidal
ideation and engaged in a detailed discussion of Harder's depres-
sion treatment following her accident, but she concluded that
these impairments did not affect Harder's ability to concentrate
or interact with others to a degree that would impair her ability
to work.

Harder has not explained how further consideration would
compel a different conclusion. The record reflects that the ALJ
considered Harder's depression at length, particularly her treat-
ment following her accident.  Instead, Harder points to her
mother's testimony as evidence that her depression increased to
such a severity to preclude any ability to work.  At the hearing,
Harder's mother stated that she would sit up nights with her
daughter to make sure she made it through the night.  It is true
that the ALJ did not cite specifically to this sentence, but the
ALJ did refer to other statements Harder's mother made at the
hearing.  The ALJ referred to Heather's testimony that Harder
could be difficult to deal with and generally was home bound.
However, the ALJ determined that the medical evidence of record
did not support a conclusion that Harder was homebound, explain-
ing that Dr. Durak and Dr. Kravitz's assessments were contrary to
this conclusion.  The ALJ was not required to adopt Heather's

testimony or to address every statement she made at the hearing. Her references to Heather's testimony show that she gave it consideration and determined that the record as a whole did not support it.

Next, Harder contends that the ALJ's hypothetical question to the VE failed to set out all of her impairments. The ALJ determined that Harder had moderate difficulties in her ability to understand and remember and carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work situations and to changes in a routine work setting. At the hearing, the ALJ did not include any of these functional limitations in her hypotheticals to the VE, and instead described a hypothetical individual who was capable of performing light unskilled work, but "is limited to only simple instructions, only routine tasks, no public interaction, only low stress work which I define as only occasional changes in the work setting, and only occasional interaction with supervisors and coworkers." (Tr. 29) Harder complains that these limitations do not fully describe the limitations contained in the RFC, particularly her moderate limitations with concentration, persistence, and pace.

"[F]or most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2010). A hypothetical question that limits the claimant to simple, repetitive tasks will not necessarily elicit a response from the VE that excludes positions which would be unavailable to someone with limitations in concentration, persistence, and pace. *O'Connor*, 627 F.3d at 620. This is because "the ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor*, 627 F.3d at 620. The Seventh Circuit has not imposed a per se rule mandating that the ALJ include the specific terminology "concentration, persistence and pace" in the hypotheticals she poses. And there are, of course, exceptions to the general rule. *O'Connor*, 627 F.3d at 619. If the record reveals that the VE independently reviewed the medical history or heard testimony addressing the limitations directly, the ALJ need not include the limitations of concentration, persistence, and pace in the hypotheticals.

The Seventh Circuit also has allowed alternative phrasing that specifically excludes the skills that someone with the claimant's limitations would be unable to perform. *O'Connor*, 627 F.3d at 619. However, this is most often permitted when the claimant's limitations arose from stress or were panic-related. For example, the Seventh Circuit found that a hypothetical limiting the claimant to repetitive, low-stress work fully accounted for the claimants limitation on concentration, persistence, and pace, because the claimant's limitations in these areas arose from stress. *O'Connor*, 627 F.3d at 619 (*citing Johansen v. Barnhart*, 314 F.3d 283, 285, 288-89 (7th Cir. 2002)). In a closer call, the claimant's limitations in concentration, persistence, and pace stemmed from his chronic pain syndrome and somatoform disorder. *O'Connor*, 627 F.3d at 620 (*citing Simila v. Astrue*, 573 F.3d 503, 522 (7th Cir. 2009)). The ALJ did not include the limitations on concentration, persistence, and pace in the hypotheticals he posed to the VE, but he did mention the underlying conditions. *Simila,* 573 F.3d at 522. The Seventh Circuit concluded that the questions posed to the VE accounted for the claimant's limitations because there was an obvious link between the claimant's pain and his concentration difficulties. *O'Connor*, 627 F.3d at 620 (*citing Simila*, 573 F.3d at 521).

In *O'Connor,* the Seventh Circuit acknowledged these exceptions and concluded that a hypothetical limiting the claimant to unskilled work did not account for moderate restrictions on concentration, persistence, or pace. The court explained that it was not clear whether a hypothetical limiting the claimant to unskilled work would cause the VE to "eliminate positions that would pose significant barriers to someone with the applicant's depression related problems in concentration, persistence, and pace." *O'Connor*, 627 F.3d at 620. Limiting the claimant to simple, repetitive work may have accounted for her limitation to learn a task of given complexity, but did not account for the claimant's limitations to stick with a given task for a period of time. *O'Connor*, 627 F.3d at 620.

The Commissioner argues that the hypothetical the ALJ posed fell into an exception because the ALJ used alternative phrasing and specifically excluded the tasks that someone with Harder's limitations would be unable to perform. Specifically, the Commissioner urges that the hypothetical accounted for Harder's limitations in concentration, persistence, and pace because it limited Harder to unskilled work. However, the *O'Connor* decision specifically rejected the Commissioner's argument that a hypothetical restricting the claimant to unskilled work accounted for moderate limitations in concentration, persistence, and pace, and

47

the court sees no grounds on which to distinguish this matter. *O'Connor*, 627 F.3d at 620. In both cases, the claimant's limitations in concentration, persistence, and pace stemmed from depression, not from stress or panic disorders. The hypothetical limiting the claimant to unskilled work did not eliminate Harder's triggers for depression, and therefore did not alert the VE to rule out jobs that triggered an inability to concentrate. Furthermore, there is no evidence that the VE independently reviewed the medical record or heard testimony directly addressing these limitations, and even so, the court must assume the VE's attention was focused on the hypotheticals and not the medical record. *O'Connor*, 627 F.3d at 619. For these reasons, it is not clear that the VE considered Harder's moderate limitations in concentration, persistence, and pace when responding to the hypotheticals, and the ALJ's decision must be remanded for further development on this issue.

Finally, Harder argues that the ALJ's decision should be reversed and a finding of disabled entered because Dr. Rajewski's report should have been adopted and, if it was, the VE testified that there would not be any jobs Harder could perform if she was limited to the extent Dr. Rajewski reported. Harder goes on to argue that the ALJ asked the VE about the effect that more than three absences per month would have on employment. The VE

testified that this would eliminate all work.  However, the ALJ did not adopt these limitations in her RFC, and the court already has found that the ALJ's RFC finding was supported by sufficient evidence and rejected Harder's argument that Dr. Rajewski's assessment must be adopted.  Therefore, Harder has provided no basis on which to require reversal on these issues.

_____

Based on the foregoing, the decision of the Commissioner is **REMANDED.**

ENTERED this 11th day of January, 2013


s/ ANDREW P. RODOVICH
United States Magistrate Judge